JOHN NEUFELD, JR., Plaintiff, *v.* WILLIAM O'DWYER et al., Defendants.

Supreme Court, Special Term, New York County, April 12, 1948.

*John T. Kreeger* for plaintiff.

*John P. McGrath, Corporation Counsel (Harry E. O'Donnell, Reuben Levy, Hyman Liebowitz* and *Francis J. Gibbons* of counsel), for William O'Dwyer and others, defendants.

*Gerald J. Carey, Irving Wise* and *Harold Weintraub* for New York City Housing Authority, defendant.

VALENTE, J. This is a motion to dismiss for insufficiency the complaint in a taxpayer's action brought against the Mayor of the City of New York and the other members of the Board of Estimate, the various borough presidents and other city officials and the New York City Housing Authority. The action seeks to enjoin the defendants from proceeding with a housing project involving four separate development sites, and from various acts in furtherance thereof, including the sale of notes or certificates of indebtedness and bonds, the payment of moneys pursuant to a subsidy-guaranty contract, the condemnation of land in the areas selected for the project, etc.

The complaint is a verbose, prolix conglomeration of charges and accusations, many of which represent nothing more than conclusions of law without ultimate facts to support them. The various contentions of the plaintiff will be taken up *seriatim.*

The principal basis for plaintiff's attack upon the housing project seems to be his claim that the project is not " low rent housing " within the meaning of section 1 of article XVIII of

the Constitution of this State and subdivision 23 of section 3 of the Public Housing Law. Plaintiff alleges upon information and belief that eligibility to tenancy in the proposed project will be increased so as to include families with annual incomes equaling or in excess of $4,500 per year, whereas hitherto low-cost public housing has been available only to families having an annual income not exceeding $1,490 or, in the case of families with three or more minor dependents, $1,788, and after the start of World War II in the case of families of more than five persons, $2,100.

Plaintiff further alleges that whereas the average rent per room in city-aided projects has ranged from $6.05 per room per month to $7 per room per month, the project now under attack contemplates a monthly rental of $12.50 per room. Plaintiff avers that the monthly rental of $12.50 per room exceeds, in the majority of cases, the rentals paid by tenants in multiple dwellings of modern and sanitary construction owned by individual and corporate taxpayers of the city of New York. He accordingly charges that the proposed project, instead of calling for low-cost public housing, in fact contemplates high-cost public housing. In addition, plaintiff charges that thousands of families with a maximum income of less than $1,750 per annum are in need of public housing in this city, and that their needs are disregarded by the project here under attack, since they will be unable to pay the contemplated rent of $12.50 per room per month.

Article XVIII of the Constitution of this State, in setting up the basic framework for a program of public housing, has delegated to the Legislature the duty and the power to determine what is low rent housing and who are the persons of low incomes. Section 1 of that article declares that " the legislature may provide in such manner, by such means and upon such terms and conditions as it may prescribe for low rent housing for persons of low income *as defined by law* " (italics the court's). Pursuant to this constitutional authorization, the Legislature has defined the term " low rent housing " to mean " dwellings within the financial reach of families of low income " (Public Housing Law, § 3, subd. 23), and has defined the term " families of low income " to mean " families who are in the low income groups and who cannot afford to pay enough to cause private enterprise in their municipality to build a sufficient supply of adequate, safe and sanitary dwellings " (Public Housing Law, § 3, subd. 18). It is thus clear that

neither the Constitution nor the Legislature has fixed a precise amount in dollars and cents as the criterion of what constitutes " low rent housing " or " families of low income."

This was pointed out in *Davidson* v. *City of Elmira* (180 Misc. 1052, 1057, affd. 267 App. Div. 797) in language quoted with approval in *Borek* v. *Golder* (190 Misc. 366, 394). The court there held that the general definitions of low rent housing and of persons of low income contained in the Public Housing Law were, in view of the varying standard of income and rent in different communities, not so indefinite and uncertain as to render the statute unconstitutional.

In order to constitute low rent housing within the meaning of the Public Housing Law, the housing must be within the financial reach of families who cannot afford to pay enough to cause private enterprise. in their municipality to build a sufficient supply of adequate, safe and sanitary dwellings.

Plaintiff's allegation that families with annual incomes of more than $4,500 per year will be eligible for tenancy in the buildings proposed to be erected, is made upon information and belief, without any facts being alleged to indicate the existence of any basis for the charge. Such a conclusory statement is insufficient without more to overcome the presumption that when the eligibility limits are ultimately established .for the project, they will be fixed in conformity with the requirements of law.

Assuming, however, that eligibility to tenancy will be extended to persons or families with incomes of more than $4,500 per annum, it does not necessarily follow therefrom that the project is illegal or unconstitutional. Even families with incomes of that amount are " families of low income " within the meaning of subdivision 18 of section 3 of the Public Housing Law if they cannot afford to pay enough to cause private enterprise in their municipality to build a sufficient supply of adequate, safe and sanitary dwellings. The complaint does not. allege any facts to establish that families with $4,500 annual income can pay enough to cause private enterprise to build a sufficient supply of such dwellings. The fact that in prewar public projects built and operated by the authority the rents charged did not exceed $7 per room per month and the income limits of eligible tenants did not exceed $1,788 per annum, is inconclusive. The court can take judicial notice of the great increase in incomes during and since the war, as well as of the great increase in postwar building costs. The rise in income

levels has been such that a prewar rental of $7 per room per month may well be regarded as equivalent to a postwar rental of $12.50 per room per month. Prewar incomes of $1,788 per annum may well be thought to hold the same relative position in our economy as postwar incomes of $4,500 per annum. Certainly, the disparities complained of by plaintiff are not so great in the light of the tremendous rise in postwar incomes and building costs as to require a holding that the extending of eligibility to families with incomes of $4,500 and the proposed charge of $12.50 per room per month are wholly out of line with the eligibilities and rentals fixed for prewar public housing projects. Furthermore, a comparison between maximum income eligibilities and rents in public housing projects prior to the war and those now contemplated is in any event beside the point. There is no legal requirement that public housing projects must be limited to the very lowest rents and the very lowest income limits that have been previously set. As the attorney for the New York City Housing Authority well puts it (brief, p. 10) : '' The term ' low rent housing ' includes a variety of permissible rents ranging from the very lowest rent that can be obtained through the utilization of the full subsidy allowed by law to any other rent which is lower than that at which private enterprise can build ' a sufficient supply of adequate, safe and sanitary dwellings.' ''

As to plaintiff's claim that there is a great need for low cost housing within the reach of families having annual incomes of less than $1,750, it need only be observed that there is nothing in the Constitution or the Public Housing Law which limits public housing to families of the very lowest incomes or which requires the needs of *all* families of the very lowest incomes to be satisfied before public housing may be constructed for the benefit of low income groups whose incomes are higher than the very lowest. It is significant that while the United States Housing Act of 1937 (U. S. Code, tit. 42, § 1401, *et seq.*) speaks of families '' in the *lowest* income group '' (§ 1402, subd. 2), our Public Housing Law speaks merely of *'' low* income groups '' (§ 3, subd. 18). Nor does the allegation of the complaint that rentals paid by the majority of tenants of privately owned multiple dwellings of modern and sanitary construction in the city of New York are less than $12.50 per room per month, avail plaintiff. There is no allegation that there are sufficient vacancies in such privately owned dwellings to take care of the housing needs of persons of low income. In any

event, families of low income, as defined by the statute, are those who cannot afford to pay enough to cause private enterprise to *build* a sufficient supply of adequate dwellings. That the rents of existing dwellings in most cases may be less than $12.50 per room per month is no indication that adequate dwellings to meet the needs of persons of low income will be built under present conditions by private enterprise for rentals of less than $12.50 per room per month. No facts whatsoever have been pleaded on which the court could possibly determine at what rental private enterprise could or would build adequate dwellings under prevailing conditions.

For the reasons heretofore indicated the attack upon the housing project here involved, insofar as it is based upon the claim that the project does not call for low cost housing within the meaning of the Constitution and the Public Housing Law, must be overruled.

The complaint contains various allegations to the effect that the area involved in the proposed project is not a slum, substandard or insanitary area and that, therefore, the project is not one for slum clearance. This is, however, immaterial for section 1 of article XVIII of the Constitution of this State authorizes the Legislature to provide for low rent housing for persons of low income " *or* for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas, *or for both such purposes* " (italics supplied). The Legislature has accordingly provided that housing for persons of low income may be provided " in any section of the municipality, whether or not such section has insanitary or substandard housing conditions " (Public Housing Law, § 3, subd. 14). It is therefore clear that public housing may be constructed either for persons of low income or for slum clearance or for both. The fact that the project here under consideration does not call for slum clearance does not impair its legality as a project calling for housing for persons of low income.

The complaint also charges that the project is illegal because it contemplates class discrimination in favor of families with annual incomes between $2,000 and $4,500 per annum. There is no merit to this attack upon the project nor is there any to the claim that the project contemplates competition with private housing development and construction with a loss of the potential tax income which would be received if housing were constructed by private enterprise rather than by public housing authorities. The fact that the housing is to be constructed

pursuant to express authorization contained in the Constitution of this State is sufficient answer to these attacks.

Plaintiff also claims that the construction of the contemplated housing will produce overcrowding and slums and will depreciate adjacent real estate values. The allegations to this effect in the complaint are nothing more than conclusions without facts to support them. Here, again, however, the fact that the project is authorized by the Constitution of this State constitutes a decisive answer to the plaintiff's attacks thereon.

The charge that the project will violate existing zoning laws and regulations is a conclusion without supporting facts. The claim that the city is illegally agreeing to donate sewage, drainage, sanitation and other facilities and services as well as the beds of streets to be closed as part of the project is without merit, for sections 99, 100 and 124 of the Public Housing Law expressly authorize such donations by a municipality in connection with a public housing project.

The complaint also charges that the subsidy-guaranty contract for the project is illegal because it has not received the approval of the city council, but only that of the board of estimate. Section 97 of the Public Housing Law provides for the approval of such a contract " in the same manner as is required for approval and final authorization of capital projects *or* permanent improvements in such municipality " (italics supplied). The plaintiff's claim of illegality is predicated upon the fact that chapter 9 of the New York City Charter requires that the capital budget of the city be approved by both the city council and the board of estimate. However, the New York City Charter also provides for permanent improvements known as " Assessable Improvements " (N. Y. City Charter, ch. 12). Such improvements include such substantial permanent improvements as streets, parks, sewage disposal plants, bridges and tunnels. Assessable permanent improvements may be authorized and approved by the board of estimate without any concurring action by the city council (N. Y. City Charter, §§ 295, 300). It would seem to follow that the subsidy-guaranty contract did not require approval by the city council in addition to the approval of the board of estimate. The intention of the Legislature as expressed in various sections of the Public Housing Law was to place all authority in housing matters in the board of estimate and the city planning commission. Subdivision 7 of section 3 of the Public Housing Law provides that the term " local legislative body " shall be the board of estimate

in the city of New York. Power is conferred by the Public Housing Law on the board of estimate alone for the appropriation of money toward the expenses of the Housing Authority, for the condemnation of property and for the sale or lease of city-owned property to a housing company (Public Housing Law, §§ 96, 125, subd. 3, 130). The approval of both the city planning commission and the board of estimate is required for the approval of each plan and project (Public Housing Law, § 150), and the approval of both bodies is needed for acquisition of lands for future use (Public Housing Law, § 123).

In this connection, the construction which has been uniformly placed upon the statute, since its enactment in 1939, is entitled to considerable weight. Since the statute was adopted, numerous subsidy-guaranty contracts have been made with the approval of the board of estimate alone. On the basis of these contracts, loans aggregating many millions of dollars have been made to the New York City Housing Authority for the development of the projects involved. The contracts, without the authorization of the city council, have received the formal approval of the State Commission of Housing, the State Comptroller, the State Attorney-General, the Federal Public Housing Authority and others.

The court is in accord with the following statement contained in the brief submitted by the corporation counsel (p. 17): " In requiring the approval of these types of contracts in the same manner as is required for ' approval and final authorization of capital projects or permanent improvements in such municipality,' the Legislature contemplated that such contracts should be made under the same procedure as is required for the final authorization of a capital project. Final authorization can only mean the final act required for the approval and incurring of the obligation. Under section 223.3.0 of the Administrative Code (Williams ed., p. 365) the Board of Estimate is the body which gives final authorization to a capital project. Therefore section 97 of the Public Housing Law, contemplates the approval of this type of contract by the Board of Estimate."

The complaint also contains an attack upon the location of the Woodside site, based upon a comparison of the tax arrears on that site and those of other areas which have been considered for the project, and upon a comparison of the relative costs of acquisition of the Woodside site and of the various other areas. These objections go solely to the administrative judgment of the city housing authority, the board of estimate, the city plan-

ning commission and the other governmental agencies which are legally empowered to determine the sites for public housing projects. The fact that other areas under consideration are subject to greater liens for taxes and arrears furnishes insufficient basis for the court's substituting its own judgment as to the proper site for the project for that of the authorities legally empowered to make the selection.

A similar observation is applicable to the plaintiff's comparison of the relative costs of acquisition of the different sites.

The allegation is also made by the plaintiff that it is the intention of the city authorities to acquire the Woodside site at a cost of not less than $1,780,600, although its assessed valuation is $1,097,000, which is also claimed to be the fair market value thereof. It appears, however, from paragraph nineteenth of the complaint that the board of estimate has adopted a resolution authorizing the Woodside area to be acquired by eminent domain, and it is clear that in the condemnation proceeding for the acquisition of the site the amount to be paid will be only that which the court in charge of the condemnation proceeding fixes as the value of the condemned property.

Attack is also made upon the project because it includes four separate developments, of which the Woodside project is only one. There is, however, no provision in the Public Housing Law which indicates, expressly or impliedly, that it is illegal to combine four separate developments into a single project for financing purposes, or that it is illegal to commingle the funds of these projects.

Plaintiff also charges that the subsidy-guaranty contract and the approving resolution of the board of estimate create a city indebtedness far in excess of the city's debt limitations. The plaintiff's allegations to this effect are, however, nothing more than conclusions, and insufficient facts are set forth in the pleading to support them.

For the reasons indicated, the court is of the opinion that the complaint fails to allege facts sufficient to make out a good case against the defendants on any of the grounds mentioned in the pleading. The motion to dismiss is accordingly granted. Settle order.